**338**

Khushro GHANDI, Andrew Rotstein, Richard Magraw, Jacqueline Cotton, Matthew Moriarty, Elizabeth Moriarty, Stuart Bernsen, Randolph Wedler and Barbara Gettel, Plaintiffs-Appellants,

v.

POLICE DEPARTMENT OF the CITY OF DETROIT, Philip Tannian, Dale Tiderington, Garries Terrell, Melvin Gamblin, Robert Persyn, Donald McKinnon, Leland Blaim, Vernon Higgins, Philip Mercado, Edward Ball, John Minogue, Gerald Fayed, Clarence Kelley, William Saxbe and Federal Bureau of Investigation, Defendants-Appellees.

No. 83–1069.

United States Court of Appeals, Sixth Circuit.

Argued April 17, 1984.

Decided Oct. 18, 1984.

Rehearing and Rehearing En Banc Denied Jan. 8, 1985.

Mayer Morganroth, Southfield, Mich., Robert Rossi (argued), Boston, Mass., for plaintiffs-appellants.

Peter L. Letsmann, Police Headquarters, William B. Daniel, Detroit, Mich., Brenda Braceful (argued), Detroit, Mich., Marc Johnston (argued), Donald Pailen, Civil Div.,

Dept. of Justice, Appellate Staff, Washington, D.C., for defendants-appellees.

Before ENGEL and MERRITT, Circuit Judges, and HILLMAN, District Judge.[*]

HILLMAN, District Judge.

Plaintiffs, members and former members of the National Caucus of Labor Committees (NCLC), a "leadership cadre organization" of which the U.S. Labor Party is its political electoral arm, appeal from a summary judgment dismissing their claims against the Federal Bureau of Investigation (FBI), various federal agents and officials, and several uniformed police officers of the City of Detroit Police Department. Plaintiffs also appeal the granting of an involuntary dismissal under Fed.R.Civ.P. 41(b) of their claims against the Police Department of the City of Detroit and several of its non-uniformed police officers. Finally, plaintiffs appeal the district court's orders denying plaintiffs' Rule 37 motion to compel the production of documents and granting the FBI's motion to quash a subpoena duces tecum served by the plaintiffs upon the FBI, as well as its ruling that trial exhibit 57 was inadmissible. For the reasons stated below, we affirm in part and reverse in part.

Plaintiffs filed their complaint on July 3, 1974, alleging that an FBI investigation of the NCLC, the use of defendant Higgins as a paid informant, various unlawful acts committed by Higgins as an informant, and a search of the NCLC Detroit headquarters violated plaintiffs' first, fourth, and ninth amendment rights. Beginning in 1970, the NCLC, a voluntary political association advocating socialist reforms, was the subject of an FBI domestic security investigation for its alleged subversive activities. In April, 1974, Vernon Higgins, who previously had infiltrated the Ku Klux Klan as a paid FBI informant, contacted FBI agent Gerald C. Fayed of the FBI's Troy, Michigan, office, offering to provide information concerning the NCLC in the Pontiac, Michigan area. Since the NCLC was already under investigation by the FBI, Fayed obtained authorization to pay Higgins for any information he supplied regarding the NCLC. Thereafter, Higgins proceeded to infiltrate the NCLC.

Higgins reported to the FBI numerous times during May and June, 1974, with information regarding the NCLC. He received several cash payments for his efforts. During that time, Higgins' cover apparently was secure. On one occasion he was asked to attend an NCLC meeting in New York. In addition, he was asked by Christopher Martinson, an NCLC member, to run for the Michigan legislature as a United States Labor Party candidate, and his name actually appeared on the ballot in the fall of 1974.

On June 19, 1974, Higgins admitted to Martinson that he was an FBI informant. Plaintiffs claim that after Higgins revealed this, he voluntarily accompanied them to the NCLC office in Detroit. Defendants, on the other hand, claim the NCLC tricked Higgins into a car and, against his will, took him to Detroit for further questioning. Higgins spent the night in the apartment of a Detroit NCLC member. On the morning of June 20, Higgins returned to the Detroit NCLC office where, according to plaintiffs, he was to announce at a press conference his association with the FBI.

Between 8:00 a.m. and 9:00 a.m. on June 20, Higgins was permitted to telephone his father. Instead, he called Edward Ball at the FBI office in Pontiac, Michigan, and told him he needed assistance since he was being held at the Detroit NCLC office against his will. Shortly thereafter the FBI received two more telephone calls, one from Higgins' wife, expressing concern for Higgins' safety, and the other from an Associated Press reporter, stating that the NCLC had issued a press release stating it had discovered Higgins was an FBI informant.

[*] The Honorable Douglas W. Hillman, United States District Court for the Western District of Michigan, sitting by designation.

The FBI decided to turn the matter over to the Detroit police to obtain a search warrant. FBI agent William Jones was authorized to execute an affidavit to be used in obtaining a warrant, and Jones and several other FBI agents were authorized to accompany the Detroit police when the warrant was executed.

On the basis of Jones' affidavit, the Detroit police obtained a search warrant for the NCLC Detroit headquarters. At approximately 11:30 a.m. on June 20 several Detroit police officers and FBI agents executed the warrant, but by the time they arrived at the NCLC headquarters Higgins had been taken to the apartment where he had spent the previous night. While purportedly searching for Higgins, the agents and officers took photographs of the files and offices, and searched the NCLC members present at the scene. The NCLC members accompanying Higgins received a telephone call at the apartment, informing them of the search of their headquarters. In the confusion generated by the telephone call, Higgins escaped unharmed, and found his way back to the Detroit Police station. This lawsuit followed.

On April 11, 1974, the district court ruled that the doctrine of sovereign immunity required dismissal of plaintiffs' claims against the FBI. On January 27, 1977, the FBI filed a motion to quash a subpoena duces tecum served upon it as a non-party defendant, claiming the subpoena was improper, oppressive and irrelevant. The district court modified the subpoena by deleting five items and altering one other, and denied the FBI's motion to quash. *Ghandi v. Police Dept. of City of Detroit*, 74 F.R.D. 115, 125 (E.D.Mich.1977). On March 28, 1977, plaintiffs moved, pursuant to Rule 37 of the Fed.R.Civ.P., to compel production of documents which they claimed were covered by the subpoena but which the FBI had either failed to produce or had edited. The matter was referred to a magistrate who, after an in camera review of the documents produced, determined that the FBI had complied with the subpoena. Plaintiffs objected to the magistrate's ruling, and the district court, after

an independent review of the documents, affirmed the magistrate's ruling on August 19, 1982.

After more than six years of discovery, the district court granted a summary judgment on behalf of the individual federal agents. On October 21, 1982, the district court also granted summary judgment in favor of the uniformed police officers, on the ground that they were merely back-up officers, not searchers. Plaintiffs then proceeded to trial against the remaining defendants, the City of Detroit Police Department and the non-uniformed police officers. On November 15, 1982, more than a year after the discovery cut-off, plaintiffs served the FBI with a new subpoena duces tecum, seeking the same documents that were covered by the original subpoena. The FBI moved to quash the subpoena as untimely. On the first day of trial, the district court heard arguments on the motion and granted the FBI's motion to quash. Further at trial, plaintiffs offered into evidence an inter-office memorandum of the Detroit Police Department recording a complaint by a member of the U.S. Labor Party regarding a police raid at the party office on November 10, 1973. The district court ruled that the document, Plaintiffs' Trial Exhibit #57, was irrelevant, and therefore inadmissible. At the close of plaintiffs' proofs, the district court, sitting without a jury, granted the remaining City defendants' Rule 41(b) motion for involuntary dismissal. Plaintiffs appeal.

### The Federal Defendants

 Plaintiffs appeal the district court's ruling that the doctrine of sovereign immunity bars plaintiffs' suit against the FBI. *Ghandi v. Police Dept. of City of Detroit*, 66 F.R.D. 385, 388 (E.D.Mich. 1975). In general, "[t]he United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941) (citations omitted). This rule also applies

to a suit against a federal agency, such as the FBI, since the United States is the real party in interest. Wright, Miller & Cooper, *Federal Practice and Procedure,* § 3655, at 174 (1976); *City of Whittier v. United States Department of Justice,* 598 F.2d 561, 562 (9th Cir.1979). Plaintiffs seek to avoid the consequences of this rule by arguing on appeal that against the FBI they seek only equitable (injunctive) relief. However, it is well established that "unless sovereign immunity has been waived or does not apply, it bars equitable as well as legal remedies against the United States." *Jaffee v. United States,* 592 F.2d 712, 717 n. 10 (*citing Malone v. Bowdoin,* 369 U.S. 643, 648, 82 S.Ct. 980, 983, 8 L.Ed.2d 168 (1961)); *see also Midwest Growers Co-op. Corp. v. Kirkemo,* 533 F.2d 455, 465 (9th Cir.1976). Thus, plaintiffs can obtain injunctive relief against the FBI only if Congress by statute waived the immunity.

When the district court dismissed plaintiffs' claims against the FBI in 1974, Congress had not yet waived the sovereign immunity of federal agencies. In 1976, however, Congress amended section 702 of the Administrative Procedure Act to allow actions seeking non-monetary relief against government agencies if the agency conduct is otherwise subject to review. In *Warin v. Director, Department of the Treasury,* 672 F.2d 590, 592 (6th Cir.1982), this circuit joined other circuits in holding that in amending section 702, Congress also waived sovereign immunity for equitable actions seeking nonstatutory review of agency action under 28 U.S.C. § 1331. *See also Sea-Land Service, Inc. v. Alaska R.R.,* 659 F.2d 243, 244 (D.C.Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed. 459 (1982); *Beller v. Middendorf,* 632 F.2d 788, 797 (9th Cir.1980); *Jaffee v. United States,* 592 F.2d 712, 718–19 (3d Cir.1979). Although amended section 702 eliminates the defense of sovereign immunity in actions for specific, non-monetary relief, Congress did not alter the existing law barring the recovery of money damages against the United States. S.Rep. No. 996, 94th Cong., 2d Sess. 4–5, H.R.Rep. No. 1656, 94th Cong.2d Sess. 9, 1976 U.S.Code Cong. & Admin.News 6121, 6124.

On appeal, plaintiffs have not argued that section 702 waives the FBI's defense of sovereign immunity. We need not decide whether plaintiffs have satisfied all the requirements for non-statutory review under 28 U.S.C. § 1331, because we find their claim for injunctive relief against the FBI deficient in two respects.

■ First, we find plaintiffs' claim that they are merely seeking injunctive relief to be disingenuous. Plaintiffs' complaint sought both equitable and monetary relief. In their brief in opposition to the FBI's motion to dismiss, however, plaintiffs unequivocally stated that the equitable relief requested was "merely relief sought against the individual officers and agents and not against the United States." (Record at 8–9). Thus, it is apparent that, in the district court, plaintiffs abandoned their theory of injunctive relief in favor of a claim for money damages. Having presented their claims in the district court under one theory, plaintiffs cannot save their claim against the FBI by proceeding under a new theory on appeal. *Schneider v. Electric Auto-Lite Company,* 456 F.2d 366, 375 (6th Cir.1972); *Wiper v. Great Lages Eng'r. Works,* 340 F.2d 727 (6th Cir.), *cert. denied,* 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965).

■ Second, the amendment to section 702 does not mean that all actions in which sovereign immunity formerly would have required dismissal now will be decided on the merits. *Sea-Land Service, Inc.,* 659 F.2d at 245. By its own terms, section 702 does not affect "the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." We find that even if plaintiffs had not abandoned their claim for injunctive relief, they have not established the substantive requirements for granting such relief. Permanent injunctive relief is an extraordinary remedy which should be granted only sparingly and only for compelling reasons. *Wong v. Nelson,* 549 F.Supp. 895, 896 (D.Colo.1982). The stan-

dard is particularly high when the party to be enjoined is a law enforcement agency: "[J]udicial intervention to prevent potential injury from prospective government misconduct is only justified when such misconduct is imminent, not merely hypothetical." *Halkin v. Helms*, 690 F.2d 977, 1005 (D.C. Cir.1982) (*citing Exxon Corp. v. F.T.C.*, 589 F.2d 582, 589 n. 14 (D.C.Cir.1978)), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979). One seeking such relief must establish that there has been a persistent pattern of police misconduct as well as a substantial risk that future violations will occur. *Allee v. Medrano*, 416 U.S. 802, 815, 94 S.Ct. 2191, 2200, 40 L.Ed.2d 566 (1974); *Long v. District of Columbia*, 469 F.2d 927, 932 (D.C.Cir. 1972).

■ Here, plaintiffs concede that the FBI's surveillance of the NCLC was terminated in 1977, more than seven years ago. In addition, many of the plaintiffs in this action are no longer affiliated with the NCLC. Finally, during the decade in which this case has been pending membership in the NCLC has dwindled significantly, making it unlikely that the FBI would ever resume its surveillance activities. Under these circumstances plaintiffs are unable to demonstrate a persistent pattern of misconduct or a substantial risk of future violation. Thus, even if injunctive relief was available against the FBI, plaintiffs have not shown they are entitled to the remedy.[1] Therefore, the district court's dismissal of plaintiff's claims against the FBI is affirmed.

Plaintiffs also appeal the district court's order granting summary judgment in favor of the individual federal defendants. On appeal, this court applies the same standard in reviewing the grant or denial of a summary judgment that was used by the trial court initially under Fed.R.Civ.P. 56(c). Thus, the granting of a summary judgment will be affirmed when the record shows "that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing the record, the court must construe the evidence in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In addition, the allegations of the moving party will be "closely scrutinized," while those of the opponent will be "indulgently treated." *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir.1962).

■ Federal officials, acting within the scope of their authority, enjoy a qualified immunity from suit. *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). This immunity does not shield conduct that "transgresses a clearly established constitutional rule." *Butz*, 438 U.S. at 507, 98 S.Ct. at 2911. However, "[f]ederal officials will not be liable for mere mistakes in judgment", *id.*, and liability cannot be premised solely on a theory of *respondeat superior. Black v. United States*, 534 F.2d 524, 527–28 (2d Cir.1976); *Lander v. Morton*, 518 F.2d 1084, 1087 (D.C.Cir.1975). Each of the individual federal defendants played a different role in the investigation of the NCLC. Therefore, the conduct of each defendant must be examined to determine whether the district court was correct in granting summary judgment on the basis of qualified immunity.

### Defendants William Saxby and Clarence Kelley

Defendants William Saxby and Clarence Kelley held the positions of Attorney General of the United States and FBI Director, respectively, during the time period relevant to this lawsuit. Plaintiffs claim these officials are not entitled to qualified immunity because of their alleged gross negligence in failing to prevent the use of Higgins as an informant to infiltrate the NCLC and in failing to redress the violation of

---

**1.** For the same reasons, the district court was not in error in denying injunctive relief against the other defendants as well.

plaintiffs' constitutional rights resulting from the search of the NCLC headquarters. Plaintiffs also argue that summary judgment in favor of these officials was improper since their allegations of conspiracy turn on questions of motive and intent.

■ Generally, cases alleging a conspiracy are not well-suited to disposition on summary judgment. *First National Bank of Arizona v. City Service Co.,* 391 U.S. 253, 284–85, 88 S.Ct. 1575, 1590, 20 L.Ed.2d 569 (1968); *White Motor v. United States,* 372 U.S. 253, 259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963); *Smith v. Hudson,* 600 F.2d 60, 66 (6th Cir.1979). Plaintiffs, however, are not entitled "to get to the jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial...." *First National Bank of Arizona,* 391 U.S. at 289–90, 88 S.Ct. at 1592–93. According to Rule 56(e) of the Fed.Rules of Civ.Procedure:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

In *First National Bank of Arizona v. City Service,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), the Supreme Court interpreted Rule 56(e) as requiring a plaintiff to produce evidence in support of his allegations of conspiracy, once the moving party "conclusively showed that the facts upon which he relied to support his allegations were not susceptible of the interpretation he sought to give them." Similarly, in *R.E. Cruz Inc. v. Bruggeman,* 508 F.2d 415 (6th Cir.1975) (per curiam), we held that summary judgment was proper where the facts alleged in the complaint were directly contravened in the affidavits supporting defendants' motion for summary judgment, and where the plaintiffs' version of the facts was not presented in any deposition, affidavit or other document on file, except the pleadings. Moreover, the Supreme Court has recognized the need to pierce the pleadings in lawsuits, such as the instant one, where a complaint drafted in "constitutional colors" can subject law enforcement officials to prolonged litigation. In *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Court stated:

"Insubstantial [Bivins] lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading.... [D]amages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based upon the defense of immunity. In responding to such a motion, plaintiffs may not play dog in the manager; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits."

*Id.* at 507–08, 98 S.Ct. at 2911 (citations omitted).

■ In the present case, defendants supported their motion for summary judgment with the affidavits of William Saxby and Clarence Kelley. Saxby's affidavit stated that he had no personal knowledge or involvement in the investigation of the NCLC in Detroit. Kelley's affidavit stated he was not aware of the FBI's use of Higgins as an informant on the NCLC's activities until the day after the search of the NCLC's Detroit headquarters. These affidavits directly controverted plaintiffs' allegations that defendants Saxby and Kelley had conspired to violate plaintiff's constitutional rights. Plaintiffs failed to produce any rebutting evidence. Indeed, the record demonstrates that defendants Saxby and Kelley were sued, not because of any personal involvement in the case, but because of the positions they held at the time.[2]

---

**2.** In his deposition testimony, plaintiff Wedler explained: "Mr. Kelley is the head of the [FBI],

Since plaintiffs' allegations against defendants Saxby and Kelley were supported by nothing more than a claim of vicarious liability, summary judgment was proper.

### The FBI Agents

 Plaintiffs also sued several FBI agents who, in varying degrees, were connected with the FBI's investigation of the NCLC in Michigan.

*John Minogue.* Defendant John Minogue was an FBI special agent in New York during the relevant time period. Minogue's only connection with Higgins occurred when Higgins went to New York City in May, 1974, to attend a NCLC meeting. FBI agents in Michigan gave Minogue's name and telephone number to Higgins so that Higgins could contact Minogue in case of an emergency in New York. Minogue was told that an unnamed NCLC informant would be in New York on a particular weekend and might contact Minogue. Higgins went to New York but never contacted Minogue.

*Thomas J. Robinson.* Defendant Thomas J. Robinson was an FBI special agent in Detroit during the time period in 1974 relevant to this suit. Robinson was the supervisor at that time for numerous FBI domestic security investigations in the Detroit area. At that time the NCLC was the subject of a FBI domestic security investigation which had been initiated in New York and approved at FBI headquarters in Washington, D.C. Therefore, the NCLC was a group which came within Robinson's supervisory jurisdiction.

Prior to the June 20, 1974, search for Higgins, Robinson had no personal involvement with Higgins or with Higgins' activities as an informant with the NCLC. Robinson only knew Higgins was providing information on NCLC activities to special agent Gerald Fayed, who was assigned to the Oakland County FBI office. Robinson's only personal involvement in the events at issue occurred in connection with the June 20, 1974 search for Higgins. In his capacity as supervisor for the NCLC investigation, Robinson was advised on the morning of June 20, 1974, by special agent William Jones and special agent Edward Ball, that both Higgins and his wife had called the Troy, Michigan, office of the FBI and requested assistance in securing Higgins' release. Concerned for Higgins' safety, Robinson contacted the Detroit police and suggested they obtain a search warrant. Robinson then authorized special agent Jones to execute an affidavit in support of a search warrant to be used by the police and authorized several FBI agents to accompany the Detroit Police in executing the warrant. Judge Thomas Evans of the Detroit Recorder's Court issued the warrant and it was executed by the Detroit Police and several FBI agents. Robinson did not participate in or supervise the search.

*Edward J. Ball.* Defendant Edward J. Ball was a special agent of the FBI assigned to the Troy, Michigan, office during the relevant time period. Ball answered the telephone on the morning of June 20, 1974, when Higgins called the Troy, Michigan, FBI office and stated that he was being held against his will by the NCLC in Detroit and needed assistance. Ball also received a call a short time later from Higgins' wife who also expressed apprehension and requested assistance. Ball took no action based on these telephone calls except to report the calls to special agent Philip Mercado, the agent to whom Higgins had asked to speak. At Mercado's direction, Ball then telephoned the FBI office in Detroit and reported the call from Higgins to special agent William Jones. Ball subsequently repeated to Robinson what he had told Jones and informed Robinson of his call from Mrs. Higgins.

 Plaintiffs contend these federal agents are not entitled to qualified immunity for two reasons. First, plaintiffs argue that these agents knew the FBI's use of Higgins as an informant violated plaintiffs' clearly established constitutional rights. The standard for whether a citizen's consti-

---

if [Henry] Kissinger were the head of the [FBI]

I would accuse Mr. Kissinger."

tutional rights have been "chilled" by government surveillance activity was set forth in *Laird v. Tatem*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). In that case, plaintiffs argued that the existence of an army data-gathering system used to monitor the activities of lawful political activity "chilled" their first amendment right. The court rejected plaintiffs' contention holding that federal injunctive relief is not available where the complainant alleges that "the exercise of first amendment rights is being 'chilled' by the mere existence, without more, of a governmental investigative and data-gathering activity...." *Id.* at 10, 92 S.Ct. at 2324. Plaintiffs who claim their constitutional rights have been "chilled" must present evidence of a "specific present objective harm" or a threat of "a specific future harm". *Id.* at 14, 92 S.Ct. at 2326.

Thus, the government's use of informants does not by itself give rise to a constitutional violation. As stated in *Handschu v. Special Services Division*, 349 F.Supp. 766, 769–70 (S.D.N.Y.1972):

"The use of secret informers or undercover agents is a legitimate and proper practice of law enforcement and justified in the public interest—indeed, without the use of such agents, many crimes would go unpunished and wrongdoers escape prosecution. It is a technique that has frequently been used to prevent serious crimes of a cataclysmic nature. The use of informers and infiltraters by itself does not give rise to any claim of violation of constitutional rights."

 Citizens are protected, however, against excesses and abuses when the government engages in surveillance activities. *Id.* at 770. In *Handschu*, a class action was brought by 16 individual plaintiffs affiliated with various political action groups for a declaratory judgment and injunctive relief, claiming that the alleged activities of the New York City Police Department's security and investigation section were designed to, and had the effect of, chilling plaintiffs and class members from exercising their constitutional rights.

Specifically, plaintiffs alleged that the informants went beyond legitimate surveillance activities by provoking, soliciting, and inducing members of lawful political and social groups to engage in unlawful activities and by engaging in abusive tactics aimed at sowing distrust and suspicion among members of lawful political organizations. The district court, in denying defendants' motion to dismiss, found that these allegations, along with reference to a specific instance of misconduct, charged "a direct injury as a result of governmental action and threatened future harm, which at once brings the complaint beyond the pale of *Tatum.*" *Handschu*, 349 F.Supp. at 770.

In the present case we find no evidence that any of these federal agents participated in any activity beyond surveillance, or that they instructed Higgins to go beyond mere surveillance. Although Higgins' conduct may have gone beyond the limits of permissible surveillance, these officials cannot be held vicariously liable for his conduct. Accordingly, qualified immunity bars a claim of damages against these officials.

Second, plaintiffs argue that summary judgment for the federal defendants was improper because their allegations created a question of fact whether the search of the NCLC's Detroit headquarters was part of a conspiracy to violate plaintiffs' constitutional rights. Specifically, plaintiffs allege that the kidnapping scenario was contrived by Higgins in cooperation with the FBI and the Detroit Police Department for the purpose of gaining access to the NCLC's Detroit headquarters. Plaintiffs further allege that while conducting their search, the officers and agents rifled through their files, removed documents, and took photographs, demonstrating that they were more interested in gathering information regarding the NCLC than in finding Higgins.

In reviewing the record, it appears that the FBI's decision to seek a search warrant was a reasonable response to a report that an FBI informant was being held against

his will. Moreover, defendants supported their motion for summary judgment with affidavits directly denying any knowledge of, or participation in, any conspiracy to use the search for Higgins as a pretext for searching the NCLC headquarters. As discussed above, when a motion for summary judgment is supported by affidavits directly controverting plaintiffs' allegations of conspiracy, the party opposing the motion cannot merely rest on his pleadings. He must produce some evidence in support of his allegations. After several years of discovery, however, plaintiffs were unable to produce any evidence in support of their allegations. Under these circumstances, the district court was correct in applying the rules of civil procedure to avoid harassment of federal officials. *Economou*, 438 U.S. at 508, 98 S.Ct. at 2911. Accordingly, we conclude that summary judgment was properly entered in favor of these federal officials.

### Vernon N. Higgins, Philip L. Mercado and Gerald L. Fayed

*Vernon N. Higgins.* As discussed above, Vernon Higgins infiltrated the NCLC as a paid FBI informant. His duties were to report on the activities of the NCLC in the Detroit and Pontiac, Michigan, areas. As an informant, he received no salary but was paid on several occasions for the information he provided. While plaintiffs concede that it was lawful for the FBI to use informants such as Higgins, they argue that his conduct went beyond mere surveillance, and created a material question of fact as to whether his conduct violated plaintiffs' constitutional rights.

■ As a threshold issue, we note that the principal evidence of Higgins' unlawful activities is contained in the deposition of Christopher Martinson, an original plaintiff who, in 1974, represented the U.S. Labor Party as a local steering committee member and as candidate for the Michigan Senate. Plaintiffs did not specifically bring to the attention of the district court the evidence contained in the Martinson deposition in opposition to defendants' motion for summary judgment. In *Smith v. Hudson*,

600 F.2d 60, 64 (6th Cir.), *cert. denied*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), we held that any material "properly on file" in the district court should be considered in evaluating the propriety of summary judgment, even when the response to the motion failed to "set forth specific facts showing that there is a genuine issue for trial." Defendants argue that this is a minority position which should be abandoned. We need not take this step, however, since we find ample authority for an appellate court considering evidence not brought to the attention of the trial court:

> "An appellant may not, as a general rule, overturn a summary judgment by raising in the appellate court an issue of fact that was not plainly disclosed as a genuine issue in the trial court. This general rule, must, however, be intelligently applied. And if the appellate court becomes convinced that the appellant, although acting in good faith, has somehow or other failed to raise at the trial court level a genuine factual issue that is, nevertheless, present in the case it should make such a disposition of the appeal that will permit him to do so."

Moore's Federal Practice ¶ 56.27(1), at 56–1557; *see also Smith v. United States*, 362 F.2d 366 (9th Cir.1966); *Chapman & Dewey Lumber Company v. United States*, 359 F.2d 495 (6th Cir.1966); *McDaniel v. Travelers Insurance Company*, 494 F.2d 1189 (5th Cir.1974). The need to avoid rigid application of procedural rules is especially apparent in cases, such as the instant one, where important first amendment rights are at stake. Thus, in considering plaintiffs' contention, we exercise our discretion to examine the whole record, not just the evidence specifically called to the attention of the district court.

■ Plaintiffs claim that undercover agent Higgins, while acting as an informer for the FBI, engaged in excessive, illegal and abusive conduct with the purpose of disrupting legitimate NCLC political activities. It is their further claim that it was Higgins' purpose, under directions from defendants Mercado and Fayed, to sow dis-

trust and suspicion among the NCLC membership and others who advocated unorthodox or dissenting political and social views. Further, that his provocative conduct was designed to discourage and frighten others from associating with members of the NCLC and from becoming members. In sum, it is their claim that the totality of Higgins' conduct, in excess of legitimate undercover activities, effectively deprived plaintiffs of their first amendment rights of freedom of communication and association, as well as other rights.

The record contains the following evidence in support of the claim that Higgins acted, not only as an informant, but also as an agent provocateur.

(1) According to the deposition of Christopher Martinson, one of the initial plaintiffs, the NCLC is a non-violent, socialist political organization which expounds "world production through a new international development bank involving debt moratoria on existing international banking institutions" (896). Martinson testified in his deposition that, while campaigning as a candidate for Michigan State Senator on the U.S. Labor Party slate, Higgins, while secretly functioning as an FBI informant, publicly misrepresented the NCLC as a violent organization (897); urged publicly that provocative action be taken such as picketing the FBI office (898) contrary to the philosophy of the NCLC; that Higgins, identifying himself as a member of the U.S. Labor Party, participated "in a violent picket line in a strike explicitly against my orders as a local steering committee member" (900–902); that Martinson's campaign as a member of the U.S. Labor Party was publicly misrepresented "because Mr. Higgins advocated the actions of this violent picket line, which I did not, and which the U.S. Labor Party did not, and he [Higgins] participated in it, which I did not" (905).

(2) Martinson stated that Higgins disputed his (Martinson's) political activities "through repeatedly taking information and psychological profiles" regarding Martinson and his campaign staff. (908).

(3) Martinson stated that Higgins admitted stealing two pieces of mail belonging to NCLC members, a mailing list, and two tapes from Martinson's campaign headquarters (909–910). Martinson thereafter filed a complaint with the Pontiac Police Department.

(4) According to Martinson, during the campaign, Higgins publicly "misrepresented the goals of the U.S.L.P. by making a racist remark to a particular individual on the street." This occurred at the unemployment center in downtown Pontiac, Michigan (913). The remark was that "[t]he U.S. Labor Party is out to get the white establishment." (914). This was contrary to the goals and philosophies of the Labor Party (913, 914).

(5) Higgins let his name be put on the ballot as a U.S. Labor Party candidate for state representative.

(6) The record contains a factual dispute as to whether Higgins was in fact being held against his will. Plaintiffs contend Higgins contrived the kidnapping scenario as a pretext to bring on the search of the NCLC's Detroit headquarters. In support of this contention, there is evidence that Higgins was aware of a similar kidnapping scenario which took place in New York City (879).

In reviewing this evidence, it is not our task to resolve issues of credibility. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Moore's Federal Practice ¶ 956.-15[4] at 56–579. Rather, our responsibility is to determine whether there exists a genuine issue as to whether Higgins' conduct as an informant exceeded the boundaries of legitimate surveillance. *Todd v. Heekin*, 95 F.R.D. 184 (6th Cir.1982). We conclude such a genuine issue of fact does exist in this case. If Higgins intentionally and publicly misrepresented the U.S. Labor Party's goals, and disrupted Martinson's campaign for public office on the Labor Party ticket and/or participated in a violent picket line and stole documents from the campaign headquarters, this unquestionably would be disruptive, provocative con-

duct going beyond mere surveillance. There can be no question that individuals maintain a first amendment right to associate for lawful political purposes free from governmental intrusion. *NAACP v. Alabama*, 360 U.S. 240, 79 S.Ct. 1001, 3 L.Ed.2d 1205 (1958); *Bates v. City of Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *Gibson v. Florida*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). Higgins' conduct, if reported accurately, strikes at the very heart of a free society. It amounts to a government informer making a direct attack upon the right of a fellow citizen to publicly express his political views while campaigning for public office. The Bill of Rights was added to allow men to be free and independent in order to assert their rights against their government. As stated in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1697–1698, 75 L.Ed.2d 708, 729 (1983) (Brennan, J., dissenting):

" '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1965).

'The maintenance of the opportunity for free political discussion to the end that the government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.' *Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532 [536] 75 L.Ed. 1117 (1931).

We have long recognized that one of the central purposes of the First Amendment's guarantee of freedom of expression is to protect the dissemination of information on the basis of which members of our society may make reasoned decisions about the government. *Mills v. Alabama*, 384 U.S. [214] at 218–219, 86 S.Ct. [1434] at 1436–1437 [16 L.Ed.2d 484]; *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). See A. Mieklejohn, Free Speech and Its Relation to Self-Government 22–27 (1948). 'No as-pect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny.' *Saxbe v. Washington Post Co.*, 417 U.S. 843, 862, 94 S.Ct. 2811, 2821, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting).

Unconstrained discussion concerning the manner in which the government performs its duties is an essential element of the public discourse necessary to informed self-government.

'Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes.' *Mills v. Alabama, supra* [384 U.S.] at 218–219, 86 S.Ct. at 1436–1437 (emphasis added)."

In addition, Higgins' willingness to place his name as a candidate on the U.S. Labor Party ticket went beyond an informant's role as a passive information gatherer. It placed Higgins in a position of leadership and active involvement in the party at the policy-making level. It gave him the potential to discredit the party from a position of authority. It also created the potential that the party would be discredited if Higgins' status as an FBI informant was discovered. Finally, it goes well beyond legitimate surveillance for an informant to contrive a kidnapping scenario for the purpose of having the FBI conduct a search of the group's headquarters. Viewing the evidence in a light most favorable to the plaintiffs, as we must, we find that plaintiffs have alleged a "direct injury" as a result of government action that goes beyond the mere surveillance activity discussed in *Tatem*. We conclude, therefore, that the summary judgment in favor of Higgins was error.

■ *Philip L. Mercado.* Defendant Philip L. Mercado was the senior resident agent in the Troy, Michigan, FBI office in May and June, 1974. Mercado had no contract or other involvement with Higgins until June 12, 1974. On that date special agent Fayed was about to be transferred from domestic security matters to organized crime matters, and Mercado was assigned to take over Fayed's domestic security responsibilities. As part of this transition, Fayed introduced Mercado to Higgins and explained that Higgins was associated with the NCLC and acting as an informant for the FBI. Mercado already knew that the NCLC was the subject of a domestic security investigation, and Fayed instructed Higgins to provide any further information to Mercado. Thus, Mercado "inherited" Higgins as an NCLC informant from Fayed.

Although defendants deny Mercado gave Higgins any instructions with respect to his NCLC activities, this is directly disputed by plaintiffs.[3] According to Martinson (898), Higgins told Martinson that FBI Agent Mercado had instructed Higgins "to suggest provocative actions that were illegal for NCLC and myself [Martinson] to do." (898). Again, as with Higgins, viewing the evidence in the light most favorable to plaintiffs, such orders, if true, go beyond mere surveillance. Whether or not plaintiffs can prove these facts is not the issue. Plaintiffs to date have not had an opportunity to present their case against Higgins and Mercado. Whether they can prevail on their claims can only be determined from presentation of evidence. Summary judgment in favor of Mercado was error.

*Gerald C. Fayed.* Defendant Gerald C. Fayed was an FBI agent assigned to the Troy, Michigan, office in 1974. Until the early part of June, he was responsible for all domestic security matters in Oakland County, Michigan. In April 1974, Higgins, who had previously provided confidential information to the FBI, advised Fayed that

he had come into contact with NCLC members in the Pontiac, Michigan, area. Prior to that time, Fayed had no knowledge of Higgins' involvement with the NCLC and had never discussed any such involvement with Higgins or anyone else. Higgins told Fayed that he thought the NCLC members he met might be involved in subversive activities and asked whether information on the group "would be worth anything to the FBI". Fayed knew at the time that the FBI was already investigating the NCLC generally. Accordingly, Fayed obtained authorization to make payments in the event Higgins supplied information regarding NCLC activities.

During May and first part of June 1974, Fayed met with Higgins on several occasions and received information from Higgins regarding NCLC activities. Several cash payments were made to Higgins for such information. In May 1974, Higgins advised Fayed that he had been asked by NCLC members to attend a convention in New York and inquired whether the FBI would pay his expenses. Fayed obtained FBI approval to pay such expenses and so informed Higgins.

■ Opposed to mere surveillance, however, was conduct "confessed" to Martinson by Higgins on June 19, 1974. Higgins told Martinson he had stolen property from Martinson's campaign headquarters "on behalf of the Federal defendants" (909), including two pieces of mail, "a mailing list of friends and parents of U.S. Labor Party members and potential financial contributors." Higgins further advised Martinson that he had been instructed by co-defendants Mercado and Fayed to take these materials (911). Supervisory personnel are subject to liability where evidence establishes that they "authorized [or] approved ... the unconstitutional conduct of the offending officers." *Hays v. Jefferson County, Kentucky,* 668 F.2d 869, 874 (6th

---

**3.** Defendants argue that Higgins' statements regarding what the federal agents instructed him to do are hearsay and, therefore, cannot be considered on a motion for summary judgment.

We find, however, that these statements are not hearsay, since they are admissions made by a co-conspirator. Fed.R.Evid. 801(d)(2)(E).

Cir.), *r'hg denied,* 673 F.2d 152, *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). This sworn testimony, although denied by defendants, creates a question of fact prohibiting summary judgment prior to trial. Summary judgment in favor of defendant Fayed is reversed.

**The City of Detroit Police Department**

Plaintiffs appeal the district courts' order granting summary judgment in favor of the City of Detroit uniformed police officers. Summary judgment was granted on the basis of unrefuted evidence that the uniformed officers were merely backup officers who did not actually participate in the search.

 Police officers enjoy a qualified or "good faith" immunity from suit for damages. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hays v. Jefferson County, Kentucky,* 668 F.2d 869, 874 (6th Cir.), *r'hg denied,* 673 F.2d 152, *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). Plaintiffs argue that this case falls in an exception to this rule delineated by this court in *Smith v. Heath,* 691 F.2d 220 (6th Cir.1982). In *Smith,* plaintiff, fleeing from a minor traffic offense, took refuge in his motel residence. A police officer pursued him there and, without a warrant or warning, broke into the residence and shot plaintiff. Backup officers then arrived and compounded the misconduct by conducting a warrantless search of the residence looking for evidence of a crime to justify their unlawful entry. In affirming the district court's decision holding the backup officers liable, we stated:

> "With respect to defendant's claim of qualified immunity, the district court made a specific finding that the officers involved knew their actions to be improper and that they were not performing routine or normal police procedure; that they had 'ulterior' motives in undertaking a warrantless, unconstitutional search and that no probable cause existed for their conduct.... Such conduct clearly violated constitutional rights of plaintiffs, which a reasonably prudent person would have known and justifies the conclusion of the district court that the defendants were not entitled to a qualified or 'good faith' immunity."

*Id.* at 225–26.

We find *Smith* to be readily distinguishable from the facts in the present case. In the case before us, the search was conducted pursuant to a valid warrant issued upon a showing of probable cause. Moreover, the search itself was not conducted in a manner that would have put a reasonably prudent person on notice that plaintiff's constitutional rights were being violated. As the district court correctly noted, more must be shown than that people were being patted down, photographed and searched, and that the premises were being searched when the police officers knew the search was being conducted pursuant to a valid warrant.

 In sum, the record contains no evidence that the uniformed police officers acted outside the scope of their qualified immunity. They had no direct involvement in the search. Their only function was to insure the integrity of the search by having uniformed officers visible on the scene. Thus, the district court was correct in granting summary judgment in favor of the uniformed police officers.

 Plaintiffs also appeal the trial court's order granting an involuntary dismissal of plaintiffs' claims against defendants Philip Tannian, Detroit Police Commissioner, Dale Tiderington, Sergeant in the Detroit Police Department, and the City of Detroit Police Department. A dismissal for insufficiency of evidence under Fed.R. Civ.P. 41(b) is a determination on the merits rather than an exercise of discretion by the trial court. The usual standards appli-

cable to review of a judgment on the merits in a bench trial are controlling. Thus, the scope of appellate review is limited to determining whether the findings made by the trial court are clearly erroneous. Fed. R.Civ.P. 52. The function of this court is not to decide the case de novo. We cannot substitute our judgment for that of the district court merely because we might give the facts another construction, resolve the ambiguity differently or generally view the facts differently. *See, e.g., Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *United States v. National Ass'n of Real Estate Boards*, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); *Shimman v. Frank*, 625 F.2d 80 (6th Cir.), *reh'g denied*, 633 F.2d 468 (1980). The major rationale of this rule is that the trier of fact has the opportunity to view the witnesses, to observe their demeanor, and to hear what was said in light of how it was said and in light of the totality of the proceedings. *Lydle v. United States*, 635 F.2d 763, 765 n. 1 (6th Cir.1981).

Here, the trial court found that there was no evidence that Sergeant Tiderington, the only remaining defendant involved in the search, engaged in any surveillance or took part in any conspiracy. The court also found that there was nothing unreasonable about the search insofar as Sergeant Tiderington was concerned. Regarding Police Chief Philip Tannian, the district court found that there was no evidence of deliberate indifference or gross negligence or recklessness with reference to a conspiracy to deprive plaintiffs of their civil rights as required by *Hays v. Jefferson County, Kentucky*, 668 F.2d 869, 873 (6th Cir.), *reh'g denied*, 673 F.2d 152, *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982).

Finally, with regard to the City of Detroit Police Department, the district court found that there was evidence of surveillance, but there was no evidence of illegal surveillance, harrassment or illegal use of informants that show the kind of objective harm that would subject the city to liability under *Tatem*. The district court also held

the search was lawful since a valid warrant was issued, and probable cause was found. Moreover, the evidence showed that the FBI agents, who had already been dismissed from the case, were responsible for photographing the NCLC's files. Lastly, the district court found that there was no evidence that the search was a setup or part of an FBI-Detroit Police Department conspiracy.

After reviewing the record, we find that these findings were supported by the evidence and justify the trial court's conclusion that no basis of liability exists against these city defendants for either the surveillance, search, or alleged conspiracy. Accordingly, we affirm the district court's involuntary dismissal of defendants' claims against defendants Tiderington, Tannian and the City of Detroit Police Department.

**Discovery and Evidentiary Questions**

Plaintiffs also contend that the district court erred in denying their Rule 37 motion to produce documents. On January 20, 1977, plaintiffs served upon the FBI a subpoena duces tecum for the production of documents. The FBI, which had been dismissed as a defendant on April 11, 1975, moved to quash the subpoena as improper, oppressive and irrelevant. The district court held that the subpoena was improper, and modified the subpoena to prevent a "general fishing expedition." *Ghandi v. Police Dept. of City of Detroit*, 74 F.R.D. 115, 123 (E.D.Mich.1977). After the FBI responded to the modified subpoena, plaintiffs moved to compel further production of documents, claiming the FBI had not produced all the documents required and had made improper deletions in the documents it did produce. In response to plaintiffs' motion, the district court required the FBI to submit affidavits attesting that it was not withholding any requested documents, and to submit unedited copies of the documents it had produced with deletions for in camera review by a magistrate. On April 3, 1979, after a page-by-page review of the materials submitted in camera, the magistrate denied plaintiffs' motion to compel

further production. Nearly seven months later, plaintiffs objected to the magistrate's opinion. After conducting its own in camera review of the documents, the district court agreed with the magistrate's decision, holding that the FBI had produced all the documents requested and had properly invoked the informant's privilege in excising portions of the documents produced.

Under *Rovario v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957), when information is withheld based on the informant's privilege, the court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." Some of the factors the court must consider are other opportunities for discovery already provided, the nature of the informer's role, the nature of the FBI activities, the possibility of reprisal, and the public interest in preserving the anonymity of informers. *Black v. Sheraton Corp.*, 564 F.2d 550, 555 (D.C.Cir.1977).

Clearly, the district court, which had the opportunity to review the documents in camera, was in the best position to balance these competing interests. Moreover, the discovery rules vest broad discretion in the trial court. An order denying further discovery will be grounds for reversal only if it was an abuse of discretion resulting in substantial prejudice. *Humble v. Mountain State Construction Co.*, 441 F.2d 816, 818–19 (6th Cir.1971); *In re Surety Ass'n of America*, 388 F.2d 412, 414 (2d Cir.1967).

We find no abuse of discretion in the present case. The FBI produced nearly a thousand pages of documents in response to the modified subpoena duces tecum. Both the magistrate and the district judge conducted a page-by-page in camera review before ruling on plaintiffs' motion. In addition, there is no evidence that the district court's decision resulted in substantial prejudice. The FBI produced ample documentation for the plaintiffs to prepare their case, and the district court was willing to conduct a further review on the basis of a written submission of particular deletions. (Record at 319–20). Accordingly, we find no reversible error in the district court's order denying plaintiffs' motion to produce documents.

Next, plaintiffs contend that the district court erred in quashing their trial subpoena duces tecum. On November 15, 1982, more than a year after the discovery cut-off and while the case was on 24-hour call for trial, plaintiffs served a new subpoena duces tecum upon the FBI. The FBI moved to quash on the ground that it was inappropriate to reopen discovery on the eve of trial. The district court agreed, reasoning that there had been ample opportunity over a period of seven to eight years to complete discovery and to obtain all the documents necessary.

The decision to quash a pre-trial subpoena duces tecum "must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues." *United States v. Nixon*, 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974). Its determination "will not be disturbed on appeal unless it clearly appears arbitrary and finds no support in the record." *Sue v. Chicago Transit Authority*, 279 F.2d 416, 419 (7th Cir.1960). *See also Nixon*, 418 U.S. at 702, 94 S.Ct. at 3104; *Shotkin v. Nelson*, 146 F.2d 402, 404 (10th Cir.1944).

Here, the district court's decision to quash the subpoena duces tecum is supported by the record. As mentioned earlier, the district court, in ruling on plaintiffs' original subpoena duces tecum, expressed its willingness to review specific objections to the documents produced by the FBI upon submission by plaintiffs. Plaintiffs, however, did not avail themselves of this opportunity. Instead, they waited until just before trial to issue a new subpoena duces tecum which, plaintiffs admit, sought production of the same documents covered by the original subpoena duces tecum. Thus, the record demonstrates that plaintiffs were given ample opportunity to complete discovery before trial. Accordingly,

we find that the district court did not abuse its discretion in deciding to quash plaintiffs' trial subpoena duces tecum.

 Finally, plaintiffs appeal the district court's exclusion of trial exhibit 57. This document, an inter-office memorandum of the Detroit Police Department, summarizes a complaint by a member of the U.S. Labor Party regarding a police raid at the party office on November 10, 1973. Plaintiffs argue that this exhibit was relevant under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), to show that the unlawful search and seizure was in accordance with the official policy of the City of Detroit Police Department. The district court ruled that the exhibit was irrelevant, because it was not linked to any of the remaining individual defendants, and it did not show a pattern of police misconduct as required by *Monell.*

 Under Fed.R.Civ.P. 61, an error in the exclusion of evidence is not ground for disturbing a judgment "unless refusal to take such action appears to the court inconsistent with substantial justice." In addition, the burden of showing prejudice rests on the party claiming that the evidence was erroneously excluded. *Westwood Chemical, Inc. v. Owens-Corning Fiberglass Corp.*, 445 F.2d 911, 918 (6th Cir.1971). This burden is especially onerous in a bench trial, since "rules of admissibility should not be applied with the same strictness where the case is tried before the court without a jury." *United States v. 1291.83 Acres of Land*, 411 F.2d 1081, 1086 (6th Cir.1969). We find no reason to disturb the district court's ruling in the present case. The record shows that the trial judge, sitting without a jury, read the exhibit and considered its contents before concluding it was irrelevant. Since the exhibit was actually considered by the trier of fact, plaintiffs are unable to show that the decision not to admit it into evidence was prejudicial. We, therefore, find that even if the exhibit was relevant under *Monell,*

the decision to exclude it was harmless error.

## CONCLUSION

For the reasons set forth above, we hold as follows:

We affirm the district court's order granting summary judgment in favor of the Federal Bureau of Investigation, and federal defendants William Saxbe, Clarence Kelley, John Minogue, Thomas Robinson and Edward Ball.

We affirm the district court's order granting summary judgment in favor of the uniformed City of Detroit Police Officers.

We affirm the district court's order entering an involuntary dismissal in favor of the City of Detroit Police Department and Officers Philip Tannian and Dale Tiderington.

We find no reversible error in the district court's orders denying plaintiffs' motion to compel further production of documents and granting the FBI's motion to quash plaintiffs' trial subpoena duces tecum.

We find no reversible error in the district court's ruling that trial exhibit 57 was inadmissible.

We reverse the district court's order granting summary judgment in favor of federal defendants Vernon Higgins, Philip Mercado and Gerald Fayed and remand that portion of the case to the district court for proceedings not inconsistent with this opinion.