therefore, deficient in light of this regulation.

Davila Mem.Ex. C (Letter from Kristin L. Dubelier, General Attorney, Department of the Treasury, U.S. Customs Service, to Lee J. Rohn, Esq., at 1 (Jan. 31, 1997).) The instructions offered by the Customs Service were explicit. Not only did the Customs Service advise Attorney Rohn of the relevant section of the Code of Federal Regulations, but it also extended her the courtesy of spelling out the required procedure.

On March 26, 1997, a little over two months later, Attorney Rohn again served the Customs Service with a subpoena duces tecum, this time directing it to the attention of Mr. George Weise, Commissioner, United States Customs Service. (*See* Davila Mem. Ex. D ["March Subpoena"].) Apart from her inclusion of an affidavit offering a cursory summary of the pending litigation, Attorney Rohn's March Subpoena suffered from the same defects as the January Subpoena, despite the earlier instructions provided by the Customs Service. The Customs Service patiently responded again:

> ... I have attached a copy of my letter to you on January 31, 1997 for your reference, as the current subpoena and notice of deposition contain similar defects, of which you were previously made aware.

> The subpoenas again fail to comply with the requirements contained in 19 C.F.R. § 103.22(c) (*published in* Federal Register, Vol. 61, No. 87, (May 3, 1996)). Namely, a copy of the summons and complaint in this action was not attached to the subpoena. Furthermore, and without being able to reference the complaint your affidavit merely asserts that the documents requested are "relevant"; you do not explain why those documents may be relevant to the alleged activities which are the subject of the subject complaint. In this regard, I would also encourage you, in connection with the preparation of the required affidavit, to review the factors pursuant to which a properly submitted subpoena will be evaluated by our office. *See* 19 C.F.R. § 103.23(a), (b). For the reasons stated, Customs objects to your requests for production of the specified documents.

Davila Mem.Ex. H (Letter from Kristin L. Dubelier, General Attorney, Department of the Treasury, U.S. Customs Service, to Lee J. Rohn, Esq., at 1 (Apr. 23, 1997).)

While this Court was willing to assume that the mistakes in Attorney Rohn's January Subpoena were inadvertent and unintentional, Attorney Rohn's subsequent refusal to comply with the applicable federal regulations after the Customs Service had so carefully pointed out her errors and advised her how to correct them could only have been wilfull. In light of Attorney Rohn's contrary representation to the Court of Appeals, the Court will supplement its June, 1998, opinion reported at 180 F.R.D. 284 (D.V.I.1998).

**POTOMAC ELECTRIC POWER CO., Plaintiff,**

v.

**ELECTRIC MOTOR SUPPLY, INC., et al., Defendants.**

**No. Civ.A. S–98–2519.**

United States District Court,
D. Maryland,
at Baltimore.

Nov. 29, 1999.

James P. Gillece, Jr., Paul J. Kelly, Jr., McGuire, Woods, Battle & Boothe LLP, Baltimore, MD, for Potomac Electric Power Co., Plaintiff.

Paul F. Kemp, Catterton, Kemp, & Mason, Rockville, MD, for Electric Motor and Supply, Inc., defendant.

Bruce L. Marcus, Marcus and Bonsib, Greenbelt, MD, for Ralph Force, defendant.

James P. Ulwick, Kramon an Graham, Baltimore, MD, for Charles M. Rhodes, defendant.

### MEMORANDUM OPINION

GESNER, United States Magistrate Judge.

This case has been referred to the undersigned for the resolution of discovery disputes pursuant to 28 U.S.C. § 636(b) and Local Rule 301. Plaintiff, Potomac Electric Power Company ("PEPCO"), has sued defendants, Electric Motors Supply, Inc. ("EMS") and various individuals, pursuant to the Racketeer Influenced and Corrupt Organizations provisions of the Organized Crime Control Act of 1970 ("RICO") alleging fraudulent billing practices, corrupt influence peddling, and bid rigging in connection with the repair of PEPCO motors. (Paper No. 1 at 2).[1] Pending are Plaintiff's Motion to Amend the Scheduling Order for the purpose of belated-

---

1. On February 19, 1999, the District Court dismissed Count II of the complaint which was a conspiracy claim under RICO. (Paper No. 14 at 2).

ly designating an expert witness (Paper No. 41) and Defendants' Motion for a Protective Order to preclude plaintiff's use of documents received in response to plaintiff's *ex parte* subpoenas (Paper No. 43). Both motions have been fully briefed. (Paper Nos. 41, 42, 43, 44, and 48). A telephone hearing to discuss the motions was held before the undersigned on November 4, 1999, and counsel for all parties participated.

For the reasons explained below, (1) Plaintiff's Motion to Amend the Scheduling Order is granted, and (2) Defendants' Motion for a Protective Order is denied.

## I. *Plaintiff's Motion to Amend the Scheduling Order to Designate an Expert Witness*

### A. *Factual Background*

This action was commenced by PEPCO on July 30, 1998. (Paper No. 1). The Honorable Frederic N. Smalkin entered a Scheduling Order on April 20, 1999 which directed PEPCO to designate its experts within thirty days. The Scheduling Order also provided that changes to the schedule would only be authorized by the Court for "good cause." (Paper No. 21). On May 19, 1999, PEPCO timely named one expert witness, Marc Sherman who is a Certified Public Accountant and will testify as to damages.[2]

During the course of discovery, the parties requested that the Court amend the Scheduling Order on several occasions. First, on June 30, 1999, counsel for defendant Charles Rhodes wrote to the Court and requested an extension of time to depose Mr. Sherman until the end of July 1999. In support thereof, defendant Rhodes noted that Mr. Sherman's deposition had been scheduled for July 1, 1999 but that plaintiff's counsel advised Mr. Sherman had not prepared a report, and was not prepared to testify, since plaintiff had not yet received document discovery from co-defendant Electric Motor Supply, Inc. Accordingly, plaintiff agreed to the requested extension to depose Mr. Sherman as well as an extension for the defendants to name their expert witnesses within 30 days of the deposition of plaintiff's expert. It was

specifically noted that "at this time, counsel do not request the extension of any other dates, including the date for the close of discovery." This requested amendment of the scheduling order was approved by the Court on July 1, 1999. (Paper No. 27).

On July 13, 1999, the parties jointly wrote to the undersigned United States Magistrate Judge to request an extension of the August 20, 1999 discovery deadline "only to facilitate the taking of depositions of Ralph Force, Marc Sherman, and experts to be designated by defense counsel. Such an extension is required due to scheduling conflicts between the parties and counsel, and because Mr. Sherman will be out of the country until August 16, 1999." (Paper No. 30). In response, the undersigned asked counsel to "propose a precise discovery deadline date, keeping in mind that other dates in Judge Smalkin's Scheduling Order of April 20, 1999, may be implicated." (Paper No. 29).

On July 21, 1999, the parties jointly wrote the undersigned to propose that the discovery deadline be extended until November 1, 1999 "for the limited purpose of deposing Ralph Force, Marc Sherman and experts to be designated by defense counsel." (Paper No. 31). On July 26, 1999, the undersigned amended the Scheduling Order of April 20, 1999 for the limited purpose requested. (Paper No. 32). The July 26th amendment of the Scheduling Order did not change the general discovery deadline of August 20, 1999, the dispositive motions deadline of December 1, 1999, or the pretrial conference date of February 2, 2000. (*Id.*).

On August 12, 1999, eight days before the general discovery deadline, PEPCO filed a motion to extend the discovery deadline. PEPCO requested the extension for "the limited purposes" of deposing certain current and former employees of EMS and "to facilitate the production of documents by EMS pursuant to PEPCO's Request for Production of Documents." (Paper No. 34). PEPCO withdrew its motion on August 20, 1999 (Paper No. 37), and a joint motion to extend the discovery deadline was submitted the same day. In the joint motion, the parties

---

**2.** Mr. Sherman's report was not provided to the defendants until October 11, 1999.

stipulated that certain PEPCO employees would be produced for the completion of their depositions and agreed upon dates for the exchange of outstanding interrogatory answers and requested documents. The Court approved the parties' joint request on August 23, 1999. (Paper No. 38).

On October 1, 1999, PEPCO filed a motion to amend the scheduling order in order to designate an additional expert, Keith Flohr, a senior chemist expected to testify on the issue of the resin utilized by EMS in the repair of PEPCO's motors; that motion is the subject of this Memorandum Opinion. In its motion, PEPCO claimed that it had "inadvertently neglected to designate" Mr. Flohr pursuant to the Court's Scheduling Order. PEPCO articulated three reasons why it should be permitted to designate Mr. Flohr as an additional expert: (1) the central nature of the identification of the resin to the allegations in the complaint; (2) defendants had been provided notice of Mr. Flohr's "prior testing of resin samples" at the deposition of another witness on July 13, 1999; and (3) Mr. Flohr had been identified as an expert expected to testify in PEPCO's answers to defendant Force's interrogatories on September 7, 1999. (Paper No. 41).

Defendants filed an opposition in which they argued that PEPCO's claim of inadvertent neglect was not "good cause" to amend the scheduling order in light of the fact that PEPCO had a relationship with Mr. Flohr dating back to 1994, had failed to raise the issue of Mr. Flohr's late designation despite PEPCO's involvement in multiple requests to amend the Scheduling Order, and had been told in July 1999 that defendants would oppose the attempted introduction of any chemical analysis. Defendants also argued that they had mounted a defense assuming there would be no chemical testimony by an expert witness and would be prejudiced by the designation of an expert at this late stage. (Paper No. 42). In its reply, PEPCO stated that its August and September 1999 "discovery" of six additional motors for testing, including chemical analysis of the resin, weighed in favor of permitting it to designate Mr. Flohr as an expert. Further, PEPCO asserted that defendants' claim of prejudice was disin-

genuous given that defendants had notice of Mr. Flohr's expertise starting in July 1999. (Paper No. 44). For the reasons stated below, Plaintiff's Motion to Amend the Scheduling Order is granted. However, sanctions in the nominal amount of $200 ($100 payable to defendants and $100 to the court) will be imposed upon plaintiff's counsel.

### B. *Legal Analysis*

In its motion, plaintiff maintains that the court's sole inquiry should be whether it has established "good cause" to merit an amendment of the scheduling order. While "good cause" may be relevant to the issues presented, it is not the beginning and end of the inquiry. While a party must establish "good cause" to justify an amendment of a scheduling order pursuant to Federal Rule of Civil Procedure 16, a denial of plaintiff's request to belatedly designate an expert would have the practical effect of excluding the testimony of the expert at the trial of this case. That question necessarily requires an analysis of applicable case law regarding exclusion of experts.

Rule 16(b) of the Federal Rules of Civil Procedure authorizes the district court to control and expedite pretrial discovery through a scheduling order. Recognizing that some flexibility was necessary, the drafters provided in Rule 16(b) that a "schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." Fed.R.Civ.P. 16(b).

■ "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." *Dilmar Oil Company, Inc. v. Federated Mutual Insurance Company*, 986 F.Supp. 959, 980 (D.S.C.1997), *aff'd by unpublished opinion*, 129 F.3d 116, 1997 WL 702267 (4th Cir.1997) (quoting authority). Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir.1992). Indeed, a judge's scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Gestetner Corp. v. Case Equipment Co.*, 108

F.R.D. 138, 141 (D.Me.1985). Scheduling orders are necessary tools in managing the district court's caseload as "[i]t is well known that we litigate these days under the burden of heavy caseloads and clogged court calendars." *Id.*

In *Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir.1990), the court noted that:

> [d]elays are a particularly abhorrent feature of today's trial practice. They increase the cost of litigation, to the detriment of the parties enmeshed in it; they are one factor causing disrespect for lawyers and the judicial process; and they fuel the increasing resort to means of nonjudicial dispute resolution. Adherence to reasonable deadlines is critical to restoring integrity in court proceedings.

*Id.* at 792.

In this case, plaintiff maintains that it merely need show that it has "good cause" to be entitled to an amendment to the scheduling order. The reasons offered by plaintiff for failure to timely designate its resin expert, Mr. Flohr and, therefore, the basis for amending the scheduling order are at best, conflicting and weak. In fact, it is difficult to discern from PEPCO's written pleadings the precise reason for its failure to designate Mr. Flohr as an expert until more than four months after the deadline for doing so and over a month after the discovery deadline. In its initial pleading. Plaintiff's Motion to Amend Scheduling Order, plaintiff merely states that it "inadvertently neglected"[3] to comply with the scheduling order by timely designating their expert. (Paper No. 41). It was only after the defendants opposed PEPCO's motion asserting that PEPCO had failed to establish good cause for amending the scheduling order did PEPCO, in its reply, attempt to articulate the "good cause" necessary to support their request to amend the scheduling order.

In its reply, for the first time, PEPCO elaborated on its failure to designate its expert witness as required by the Court's scheduling order. PEPCO acknowledges that as of May 20, 1999, the deadline for designating experts, Mr. Flohr had performed chemical analysis on July 1994, March 1995, April 1995, October 1995 and January 1996 but that they had inadvertently neglected to name him by the May 20th deadline. Perhaps tacitly acknowledging that counsel's neglect does not amount to the requisite "good cause," PEPCO maintains that Mr. Flohr must examine the six new motors allegedly serviced by EMS which were the product of a recent "discovery" by plaintiff in August. (Paper No. 44 at 2–3). At the hearing, however, the Court learned that the recently "discovered" motors had been under PEPCO's control at all times and that the "recent discovery" could more accurately be characterized as "recent access" to motors which had come off-line for routine service.

It should also be noted that the "discovery" of the new motors and, therefore, the need to use the services of Mr. Flohr, according to plaintiff occurred in August 1999, at precisely the same time that the parties were negotiating and preparing a Joint Motion to Extend the Discovery Deadline, which was filed on August 20, 1999. When asked why PEPCO had not raised its failure to name Mr. Flohr at the time of these discussions with defendant or in the parties' joint motion to extend the discovery deadline, plaintiff's counsel responded that he was caught up in other "hot topics." PEPCO's claim of "inadvertent neglect" is incredible in light of the fact that it had contact with Mr. Flohr dating back to 1994 and that counsel's attention was often refocused on the Scheduling Order.

Fortunately for plaintiff, the sole inquiry on its Motion to Amend the Scheduling Order is not whether "good cause" exists. If that were the case, the court would find that the plaintiff has failed to establish the requisite "good cause" and plaintiff's motion to amend the scheduling order would be denied. However, the inquiry does not end there.

■ Because the practical effect of this conclusion would be the exclusion of plaintiff's expert from the trial of this case, the

---

**3.** Similarly, as discussed in the second section of this Memorandum Opinion, plaintiff maintains that it "inadvertently" neglected to provide defendants with notice that it was serving subpoenas on third parties as required by Federal Rule of Civil Procedure 45.

court must also focus on the law applicable to the question of whether to exclude an expert witness who has not been disclosed in accordance with a scheduling order. It is well settled that the court has considerable discretion in determining whether to permit an expert, who is designated after the scheduling order deadline for doing so, to testify. *See Tallarico v. Trans World Airlines, Inc.,* 881 F.2d 566, 572–73 (8th Cir.1989) (court allowed wide discretion in determining the admission or refusal of expert testimony; no error in excluding witness where witness not made available until day preceding testimony); *Dabney v. Montgomery Ward & Co.,* 692 F.2d 49, 51–53 (8th Cir.1982), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2429, 77 L.Ed.2d 1316 (1983) (flexible application of pretrial orders within sound discretion of district court; error to exclude newly discovered, albeit late, witness); *Geiserman,* 893 F.2d at 790–92 (review of trial court's order striking late expert witness designation and precluding any expert witness testimony under the abuse of discretion standard; no error in excluding expert who was designated late); *see also Sullivan v. Glock, Inc.,* 175 F.R.D. 497, 505 (D.Md.1997) (like "Alice's Restaurant," one can find what one wants when one looks for case law supporting decision of whether to allow challenged expert to testify).

▇ In determining whether to exclude witnesses not disclosed in compliance with the scheduling order, the Court must consider four factors: 1) the reason for failing to name the witness, 2) the importance of the testimony, 3) potential prejudice in allowing the testimony, and 4) the availability of a continuance to cure such prejudice. *Geiserman,* 893 F.2d at 791; *see also Patterson v. F .W. Woolworth Co.,* 786 F.2d 874, 879–80 (8th Cir.1986) (applying similar factors in concluding that court did not abuse discretion in allowing late expert); *Sullivan,* 175 F.R.D. at 506–07 (same factors govern resolution of motion to exclude expert testimony under Fed.R.Civ.P. 37(c)(1)). Consideration of these factors here demonstrates why

Plaintiff's Motion to Amend the Scheduling Order must be granted.

As to the first factor, the reason for failing to name the witness, the Court concludes that, for the reasons discussed above, PEPCO does not have a compelling reason for the belated designation of Mr. Flohr as an expert. With respect to the second factor, the importance of the expert's testimony, PEPCO, not surprisingly, maintains that Mr. Flohr's testimony is extremely important. PEPCO has asserted both in its pleadings and during the hearing that the subject of Mr. Flohr's testimony—the identification of the resin used in the repair of the motors—is central to the allegations in its complaint. A review of the complaint supports PEPCO's contention in that it alleges that EMS failed to provide repairs in accordance with PEPCO's specifications by, *inter alia,* using polyester resins instead of the required epoxy resins and by spraying or painting motors with an epoxy coating to mask its failure to treat the motors with epoxy. (Paper No. 1 at 6). Thus, it does appear that Mr. Flohr's testimony is important to at least one of PEPCO's contentions.[4]

As to the third factor, the potential prejudice to the defendants in allowing the testimony, plaintiff maintains that there is no prejudice to defendants because they were "on notice" of the existence of Mr. Flohr and his findings regarding the use of resin. Defendants assert that Mr. Flohr's designation at this late date will prejudice them by requiring them to revisit much of the discovery already done and revise their entire defense. There is no question that the late designation of Mr. Flohr as an expert by the plaintiff will inconvenience defendants and may cause them to retool their defense. However, while the discovery deadline has passed, there is no scheduled trial date, thus removing the possibility that defendants will be surprised at trial. The prejudice necessary to cause the drastic remedy of exclusion is not present in this case. *See Tucker v. Ohtsu Tire & Rubber Co., Ltd.,* 49 F.Supp.2d 456, 462–63 (D.Md.1999) (no requisite prejudice where expert opinion supplemented be-

---

**4.** One cannot help but wonder, however, why plaintiff's counsel did not pay closer attention to

the need to designate Mr. Flohr as an expert if his testimony was so important.

fore discovery cutoff and no trial date set); *Congressional Air, Ltd. v. Beech Aircraft Corp.*, 176 F.R.D. 513, 515–16 (D.Md.1997) (disallowing rebuttal expert disclosed within twelve days of due date of pretrial order, and less than one month before trial); *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y.1995) (drastic remedy of preclusion of expert testimony should be applied only where party's conduct is in flagrant bad faith and disregard of the rules).

■ Defendants also claim they would be prejudiced by the expense of reopening discovery to prepare for Mr. Flohr's testimony, especially given their limited means in comparison to the vast resources available to PEPCO. The time and expense of further discovery, however, is not alone a sufficient basis to exclude an expert. *See Tucker*, 49 F.Supp.2d at 463 (permitting supplementation of expert's disclosure despite party's claim of added time and expense).

Similarly, the fourth factor, whether a continuance could be granted to cure any prejudice, is inapplicable in this case given that there is no scheduled trial date. There is ample time to address the designation of Mr. Flohr as an expert before a trial date is set. In sum, application of the four factors compels the conclusion that Mr. Flohr's testimony should be allowed. Accordingly, plaintiff's motion to amend the scheduling order must be granted.

The court further orders, however, that within thirty (30) days of this Order, plaintiff provide to defendants the information required by Rule 26(a)(2)(B) regarding Mr. Flohr's testimony including his reports, particularly those relating to the motors identified by plaintiff in August 1999.[5] The disclosure will be complete and unevasive. Fed. R.Civ.P. 37(a)(3). Within ten (10) days after defendants receive this information, the parties should confer and submit a proposed joint schedule to the court addressing the timing of any additional discovery necessary relating to Mr. Flohr.

Notwithstanding the court's conclusion, the court is troubled by the counsel for plaintiff's cavalier approach to deadlines in this case. The court wishes to emphasize that its conclusion should not be interpreted as meaning that the availability of a discovery continuance should supplant the remedy of exclusion of a witness where appropriate. As the Fifth Circuit has noted, "[c]oupled with appropriate sanctions, a continuance will serve the court's truth-seeking function while still allowing it to punish and deter conduct that is in violation of the rules." *Bradley v. United States*, 866 F.2d 120, 127 n. 11 (5th Cir.1989).

The granting of the plaintiff's motion will inevitably cause the court's schedule to be disrupted and will cause unnecessary delay and expense. As Chief Judge Motz noted under similar circumstances, "[t]o allow this to happen without sanctioning the responsible party would be contrary to the principles of sound case management that the Federal Rules are intended to implement." *Kessler v. Bell Atlantic Communications and Construction Services, Inc.*, Civil No. JFM 98–3446, Memorandum dated September 14, 1999 at 5 (unpublished), attached hereto as Exhibit A. The court is persuaded that under the circumstances of this case, a sanction similar to that imposed by Chief Judge Motz in *Kessler* is appropriate. Accordingly, plaintiff's counsel is to pay defendants $100 in partial compensation for the attorneys' fees spent opposing plaintiff's motion to amend, such amount to be apportioned among counsel according to time each expended in opposing plaintiff's motion. Plaintiff's counsel shall also pay $100 into the registry of the Court "to partially reimburse taxpayers for the time this court has had to expend in considering an issue that should not have been before it." Exhibit A at 6.

## II. *Defendant's Motion for a Protective Order*

### A. *Factual Background*

On August 11, 1999, PEPCO issued subpoenas for the production of documents to seven non-parties[6] without providing any no-

---

**5.** Obviously, this means that Mr. Flohr must complete *all* examinations before this deadline.

**6.** The non-parties include Allegany Power, Pennsylvania Electric Power Company, ABB Service, Inc., Grant Manufacturing, Electro–Mech, Sie-

tice to the defendants. Most of the subpoenas were actually served on August 16, 1999 and called for the production of documents at the Baltimore office of plaintiff's counsel on August 20, 1999, the day of the discovery deadline.[7] The subpoenas requested documents including, *inter alia*, invoices, purchase orders, and billing statements evidencing business transactions between the nonparties and defendants. In addition, PEPCO issued a subpoena to one non-party, Danny's Metals, well after the discovery cut-off. While the plaintiff later withdrew this subpoena (Paper No. 48 at 2), it was by virtue of this subpoena that defendants first learned that plaintiff had served *ex parte* subpoenas. This occurred when counsel for defendant Ralph Force, Bruce Marcus, was contacted in September 1999 by counsel for Danny's Metals who advised that Danny's had been served with a subpoena by plaintiff. (Paper No. 43, Affidavit of Bruce Marcus, ¶¶ 4–5). Mr. Marcus immediately telephoned one of the plaintiff's counsel, Paul Kelly, who acknowledged that numerous third party subpoenas had been issued but advised that the failure to notify defense counsel of the third party subpoenas was "inadvertent." (Paper No. 43, Affidavit of Bruce Marcus, ¶¶ 5–6).[8]

Defendants filed a Motion for a Protective Order on October 25, 1999 seeking to require PEPCO to return the documents it obtained through the *ex parte* subpoenas and to bar the use of these documents at trial. (Paper No. 43). PEPCO opposed the motion for a protective order arguing that "any lack of notice was a mere oversight" and that defendants had not been prejudiced by the lack of notice. (Paper No. 48). The issue for the Court's resolution is whether plaintiff's eleventh hour, *ex parte* subpoenas to third parties should be allowed.[9] For the reasons stated below, the defendants' Motion for Protective Order will be denied without prejudice to the defendants' ability to file any pretrial motion in limine to exclude the documents received pursuant to the subpoenas at issue or any evidence relating thereto.

### B. *Legal Analysis*

Fed.R.Civ.P. 34(c) provides that a "person not a party to the action may be compelled to produce documents ... as provided in Rule 45." Rule 45 provides, in pertinent part, that "[p]rior notice of any commanded production of documents and things or inspection of premises before trial shall be served on each party in the manner prescribed by Rule 5(b)." The purpose of the requirement of prior notice to the parties "is to afford other parties an opportunity to object to the production or inspection, or to serve a demand for additional documents or things." Fed. R.Civ.P. 45, Notes of Advisory Committee on Rules. "[C]ompliance with the notice provision is not a mere formality but serves the important function of streamlining discovery in order to alleviate duplication or delays." *Callanan v. Riggers & Erectors, Inc.*, 149 F.R.D. 519, 520 (D.Vi.1992).

men Allis, and Monarch Electric Service Company. (Paper No. 48 at 1).

**7.** Shortly before the telephone hearing on November 4, 1999, the Court requested plaintiff's counsel to provide it with copies of the subpoenas and any accompanying letters that were sent to the non-parties. (Paper No. 49).

**8.** According to Mr. Marcus' affidavit, Mr. Kelly, in a later telephone conversation, advised that James Gillece, plaintiff's other counsel, took the position, *inter alia*, that the Scheduling Order did not preclude obtaining discovery after the Order closed discovery and that there was no violation of the Rules in the use of *ex parte* subpoenas. (Paper No. 43, Affidavit of Bruce Marcus, ¶ 8). Of course, both of these positions are completely contrary to law. *See* Fed.R.Civ.P. 45; *Marvin Lumber and Cedar Co. v. PPG Industries, Inc.*, 177 F.R.D. 443 (D.Minn.1997) (Rule 45 subpoenas

duces tecum are form of discovery and, therefore, subject to court's discovery deadline); *Rice v. United States*, 164 F.R.D. 556, 558 (N.D.Okl. 1995) (same). Plaintiff's counsel wisely does not currently advance either of these arguments, instead maintaining that the lack of notice was inadvertent.

**9.** The subpoenas also appear to be invalid on their face. They were issued out of the Districts of Ohio, Alabama, and Pennsylvania, rather than the District of Maryland where production was to be made. *See* Fed.R.Civ.P. 45(a)(2) ("If separate from a subpoena commanding attendance of a person, a subpoena for production or inspection shall issue from the court for the district in which the production or inspection is to be made."); *McNerney*, 164 F.R.D. at 588 (subpoena issued out of Western District of New York invalid on face where production and inspection to be made in Tennessee).

When a party fails to receive prior notice of the information sought from a non-party, a party is deprived of its greatest safeguard under the Rule, that is, the ability to object to the release of the information prior to disclosure. *Spencer v. Steinman*, 179 F.R.D. 484, 489 (E.D.Pa.1998); *see also Mann v. University of Cincinnati*, 824 F.Supp. 1190, 1202 (S.D.Ohio 1993), *aff'd by unpublished opinion*, 114 F.3d 1188, 1997 WL 280188 (6th Cir.1997) (Rules 26 and 45 require that reasonable notice be given in writing to the recipient and other parties so that they have an adequate opportunity to object). In addition, when an attorney misuses his or her power under Rule 45 to command a non-litigant to produce documents in a lawsuit to which he or she is a stranger by failing to give appropriate notice to the parties, public confidence in the integrity of court processes is eroded. *Spencer*, 179 F.R.D. at 489.

Just as with the failure to designate its resin expert, PEPCO claims that the failure to provide notice to defendants of the non-party subpoenas was "inadvertent." (Paper No. 48 at 2). When pressed at the telephone hearing to explain the nature of the "inadvertent" failure to notify defendants, plaintiff's counsel stated that it was an oversight by his paralegal.[10] This attempt to avoid blame does not, of course, relieve plaintiff's counsel of his responsibility for the lack of notice to defendants because, pursuant to Rule 45, "an attorney, as an officer of the court, is delegated the power to command a non-litigant to produce documents in a lawsuit." *Spencer*, 179 F.R.D. at 489 (supervising attorney is vicariously liable for paralegal's oversight in not providing notice to parties when issuing subpoenas duces tecum to non-parties); *see also Attorney Grievance Comm'n v. Goldberg*, 292 Md. 650, 441 A.2d 338, 341 (1982) ("An attorney may not escape respon-

sibility . . . by blithely saying that any shortcomings are solely the fault of his employee.").

While recognizing that notice should have been given to the defendants, plaintiff's counsel maintains that he has now provided to the defendants all documents received in response to the *ex parte* third party subpoenas. Accordingly, plaintiff's counsel argues that defendants have not suffered any prejudice as a result of the initial lack of notice. What plaintiff's counsel overlooks, however, is that defendants received the documents well after the discovery deadline in this case and may very well be prejudiced by their inability to do timely follow up investigation relating to the documents.[11]

On the issue of timeliness, the defendants argue that plaintiff's subpoenas were served belatedly, on the eve of the discovery deadline, in violation of the Scheduling Order. Plaintiff blithely responds that the subpoenas were served within the discovery period and the production was to be completed by the discovery deadline. (Paper No. 48 at 4). However, most of the subpoenas to non-parties were issued on August 11 but were not served until August 16, four days before the August 20th discovery deadline. At least one subpoena, the Danny's Metals subpoena which was later withdrawn by plaintiff, was issued more than a week after the discovery deadline. During the hearing, plaintiff's counsel attempted to minimize the eleventh hour timing of the subpoenas by stating that he had been in prior telephone contact with the non-parties and had asked them to begin looking for the requested documents. Nevertheless, plaintiff's counsel acknowledged that several of the non-parties requested additional time to comply and that PEPCO received some, perhaps most, of documents after the discovery deadline.[12]

---

10. It should be noted, however, that the cover letters which preceded or accompanied the third party subpoenas were signed by counsel for plaintiff, Mr. Kelly, and the subpoenas themselves were signed by the other counsel for plaintiff, Mr. Gillece. (Paper No. 49). There was no indication that defense counsel was being copied on any of these documents.

11. The court does note that defendants have not indicated that they would have had a substantive basis upon which to object to the documents.

12. It is around the same time in mid-August when the parties were negotiating a joint motion to extend the discovery deadline for other purposes. Thus, the question is why PEPCO did not raise with the defendants the fact of the subpoenas or the need for a possible extension of the

■ The court finds that, as a practical matter, it was difficult, if not impossible, for the third parties to comply with the subpoenas by the discovery deadline. *See* Local Rule 104.2 ("Interrogatories, requests for production, and written deposition questions must be made at a sufficiently early time to assure that they are answered before the expiration of the discovery deadline set by the Court."). In order to alleviate any possible prejudice to the defendants as a result of the production by plaintiff of the third party documents after the discovery deadline, the Court will order the plaintiff to advise defendants of any use it intends to make of the documents received from the third party subpoenas as described in further detail below.[13]

As to the substance of the documents in question, PEPCO argues that they should not be precluded from using those documents because they are important in that they may show (1) that the defendants committed similar fraud in their dealings with those third parties whose machinery, like PEPCO's, was serviced by defendants; and (2) that the defendants fraudulently billed PEPCO for repair work which defendants did not order or pay third parties to do.[14] At the time of the telephone hearing, neither plaintiff nor defendants had had an opportunity to review thoroughly the third party documents, and their impact on the case was not yet clear. As a practical matter, it appears that to the extent that plaintiff seeks to use the documents in question at trial, the admissibility of at least some of the documents will be determined pursuant to Federal Rule of Evidence 404(b) relating to evidence of other crimes,

wrongs or acts. Indeed, plaintiff's investigation relating to these documents may not yield any evidence the plaintiff intends to use at trial. If plaintiff intends to offer any of those documents, the defendants will have an opportunity to challenge their admissibility at the appropriate time through a pretrial motion in limine.

The court concludes that plaintiff's counsel's conduct in issuing the subpoenas to non-parties for the production of documents without prior notice to all parties violated Rule 45. Given the circumstances of this case and the availability of other appropriate sanctions as discussed below, the court does not believe it appropriate to grant the relief sought by defendants in their Motion for Protective Order, that is, that plaintiff be directed to return the documents to the third parties and be precluded from using the documents at trial.

Accordingly, the Defendants' Motion for Protective Order is denied without prejudice to the defendants' ability to file any pretrial motion in limine to exclude the documents received pursuant to the subpoenas at issue or any evidence relating thereto. As a sanction, however, plaintiff's counsel is admonished against issuing any future third party subpoenas without prior notice to all parties. Plaintiff's counsel must file an affidavit with the court, within thirty (30) days of this order, affirming that they have counseled all pertinent employees of their law firm as to the notice requirements of Federal Rule of Civil Procedure 45 regarding third party subpoenas.[15] Further, plaintiff's counsel must

---

deadline to procure discovery from the non-parties.

**13.** Under appropriate circumstances, courts have not hesitated to quash subpoenas where they were used as a means to reopen discovery after the cut-off date. *See Buhrmaster v. Overnite Transportation Co.,* 61 F.3d 461, 464 (6th Cir. 1995), *cert. denied,* 516 U.S. 1078, 116 S.Ct. 785, 133 L.Ed.2d 736 (1996) (affirming district court's decision to quash subpoenas of material that could have been produced through normal discovery where plaintiff used subpoena to circumvent discovery deadline); *Ghandi v. Police Dept. of City of Detroit,* 747 F.2d 338, 354–55 (6th Cir.1984) (affirming district court's decision to quash subpoena issued on the eve of trial seeking documents available during discovery); *McNer-*

*ney,* 164 F.R.D. at 588 (quashing subpoena issued to third party after the deadline for completing discovery had passed).

**14.** With respect to the documents subpoenaed from the third-party vendors, plaintiff's counsel stated at the hearing that he intends to compare the bills which these vendors submitted to EMS for work which they performed on PEPCO motors with the bills which EMS in turn submitted to PEPCO for this work.

**15.** While it is the attorney who has the authority to use Rule 45 subpoenas, plaintiff's counsel should also counsel all pertinent paralegals since it is counsel for plaintiff's position that the paralegal inadvertently did not provide notice of the subpoenas.

file an affidavit which confirms that all documents produced to them pursuant to the third party, *ex parte* subpoenas have been produced to the defendants. Finally, within thirty (30) days of this order, plaintiff's counsel shall advise defense counsel of the use at trial, if any, plaintiff intends to make of the documents produced pursuant to the third party, *ex parte* subpoenas. Such notice shall include the precise documents or information derived therefrom plaintiff intends to use, the precise purpose for which plaintiff intends to use the documents or information derived therefrom, and the witnesses through whom plaintiff intends to introduce the documents or any information derived therefrom. Within ten (10) days thereafter, the parties should confer and submit a proposed joint schedule to the court addressing the timing of any additional discovery necessary resulting from these documents.

The dispositive motions deadline of December 1, 1999 and the pretrial conference deadline of February 2, 2000 are hereby canceled. The court will set new dates for each after it receives the proposed joint schedule from counsel regarding the timing of any additional discovery relating to Mr. Flohr's expert designation and the third party *ex parte* documents.

## III. Conclusion

For the reasons stated above, Plaintiff's Motion to Amend the Scheduling Order is granted and Defendants' Motion for a Protective Order is denied. A separate Order will be issued.

### ORDER

For the reasons stated in the Memorandum Opinion entered herewith, it is this 29th day of November, 1999, hereby ORDERED:

1. Plaintiff's Motion to Amend the Scheduling Order is GRANTED;

2. Defendants' Motion for a Protective Order is DENIED;

3. Plaintiff's counsel is required to pay $100.00 to the defendants and $100.00 to the Clerk of Court, said payments to be made on or before December 10, 1999;

4. Within thirty (30) days of this Order, no later than December 28, 1999, plaintiff's counsel shall file an affidavit with the court: (a) affirming that they have counseled all pertinent employees of their law firm as to the notice requirements of Federal Rule of Civil Procedure 45 regarding third party subpoenas; and (b) confirming that all documents produced to them pursuant to the third party, *ex parte* subpoenas be produced to the defendants;

5. Within thirty (30) days of this Order, no later than December 28, 1999, plaintiff's counsel shall provide to defense counsel in writing: 1) the information required by Rule 26(a)(2)(B) regarding Mr. Flohr's testimony including his reports, particularly those relating to the motors identified by plaintiff in August 1999; and 2) the use at trial, if any, plaintiff intends to make of the documents produced pursuant to the third party *ex parte* subpoenas, detailing the information set forth in the accompanying Memorandum Opinion; and

6. Within ten (10) days of the receipt of the information described in paragraph five (5), no later than January 7, 2000, counsel for plaintiff and defendants should confer and submit a proposed joint schedule to the court addressing the timing of any additional discovery relating to Mr. Flohr's testimony and/or the third party *ex parte* documents.

7. The dispositive motions deadline of December 1, 1999 and the pretrial conference date of February 2, 2000 are hereby canceled and will be rescheduled by the court upon the receipt of the joint proposed schedule of the parties.

### EXHIBIT A

### LAURA E. KESSLER

v.

### BELL ATLANTIC COMMUNICATIONS AND CONSTRUCTION SERVICES, INC.

Civil No. JFM–98–3446

MEMORANDUM

Presently pending before the court is a motion filed by defendant to strike two affi-

davits submitted by plaintiff with her opposition to summary judgment motion filed by defendant.[1] The motion will be denied. However, sanctions in the nominal amount of $250 ($125 payable to defendant and $125 to the court) will be imposed upon plaintiff's counsel.

Plaintiff worked as a Multi Media Services Technician ("MMST") and, as such, was responsible for installing and maintaining telephone facilities and equipment at customers' residences and businesses. Plaintiff claims that her employment was wrongfully terminated because she became pregnant. Defendant contends that plaintiff was not discharged because of her pregnancy but because plaintiff's doctor placed upon her certain medical restrictions, including not climbing telephone poles. According to defendant, it has a neutral policy, applicable to all of its employees, of not assigning MMSTs who are expected to be subject to medical restrictions for more than a few days to jobs where they are restricted from working. Instead, defendant asserts, its policy is to terminate the employment of such employees.

## I.

Defense witnesses have testified that defendant has decided upon its policy because it is unable to effectively or economically assign MMSTs to light duty jobs that do not require them to perform the full range of their duties. In opposing defendant's summary judgment motion, plaintiff has submitted the affidavits of Robin Rohls and Donald Fuller, III. Ms. Rohls once worked as a dispatcher for defendant. In her affidavit she avers to the following:

The technology available to me as a dispatcher for BACCSI enabled me to know whether a particular job required any pole climbing. Based upon the customer's complaint, location of the home, and age of the particular development, loaders and dispatchers had the ability to scan the work orders and assign ground

only jobs. There were always a large number of ground jobs.

As a dispatcher, I was requested on numerous occasions by supervisors of different garages in Virginia to give male employees ground only jobs. I was always able to comply with these requests.

I know of at least two cases where male employees of BACCSI who were hurt outside of the job were given ground only jobs for extended periods of time. In addition, male employees who could not perform groundwork were often assigned to the help desk within the garage that needed to be staffed everyday.

Mr. Fuller formerly worked as an MMST for defendant. He asserts in his affidavit as follows:

In 1996, I hurt my hand outside of the scope of my employment with BACCSI. My hand was severely lacerated and I could not climb any poles for at least two (2) weeks. The length of recovery time for my hand was estimated at between ten to fourteen days. However, it was not certain whether my hand would recover sooner or later than the estimated fourteen days.

BACCSI was aware of my condition and permitted me to ride along with another technician for at least ten business days.

On another occasion, I hurt my hand with a drill while at work. BACCSI advised me that I needed to take two weeks off without pay and collect workers compensation. I advised BACCSI that I could not afford to lose my income for two weeks. Accordingly, BACCSI assigned me to the "hot line" in the local garage for that time period.

I was not the only male given "light duty" by BACCSI. I recall in particular another male technician who was permitted to work "light duty" for approximately 4 to 6 weeks while recovering from an injury.

The job of a Multi–Media Services Technician was multifaceted and involved a lot of pedestal/ground work and inside work.

---

**1.** Defendant has, with the court's permission, postponed filing a reply memorandum until its

motion to strike affidavit has been decided.

## II.

The first interrogatory propounded by defendant to plaintiff asked plaintiff to "[i]dentify all persons with knowledge of information pertaining to the claims alleged by you and describe in detail the information known to each such person." Plaintiff responded to that interrogatory as follows:

> Objection. Interrogatory No. 1 is not clear and extremely broad. Without waiving the objection, the following individuals are those persons who should have some personal knowledge of my claim/complaint: Myself, Dion Balaam, Celeste Butler, Debbie Feeley, Kevin Updyke (union steward), James Padgett (union representative), Mike Bello, Diane Shaw (EEOC investigator), and my attorney. I do not know the information known to each of these individuals. I believe Balaam, Butler, and Feeley were involved in the employment decision regarding my termination. I also believe the union representatives discussed my situation with Balaam, Butler, Feeley and other officials of BACCSI. See attached statement given to the EEOC by BACCSI. In addition, any and all individuals listed in Defendant's response to Plaintiff's interrogatories and/or request for production of documents and/or Defendant's Answer to Amended Complaint.

Plaintiff alleges that in response she "made very clear that she objected to the question because of its confusing nature and broadness." She then justifies her failure to identify Ms. Rohls and Mr. Fuller on the ground that she was referring only to "individuals who had personal knowledge about her situation and/or were personally involved in the employment decision(s) regarding her specifically."

The interrogatory is neither confusing nor overly broad. By its terms it requests identification of persons not simply with knowledge of plaintiff's own "situation" but "all persons with knowledge of information *pertaining to the claims*" which she alleges. This language must be construed in context. The *McDonnell Douglas* scheme of proof is well known to any lawyer who practices, even if only occasionally, in the area of employment discrimination law. Under that scheme of proof "comparators" such as Mr. Fuller provide an important element of a plaintiff's claims. Indeed, that is the very reason plaintiff has submitted his affidavit in opposing defendants' summary judgment motion.[2] Likewise, plaintiff submitted Ms. Rohl's affidavit because she had knowledge "pertaining to" two comparators as well as to plaintiff's assertion that defendant could efficiently assign MMSTs to jobs not requiring pole climbing.

I am satisfied that in light of the averments contained in the affidavits of Ms. Rohl and Mr. Fuller it would be contrary to the interest of justice to penalize plaintiff by having the affidavits stricken. At the same time to countenance what plaintiff's counsel has done would be to undermine the orderly litigation process established by the entry of scheduling orders. The purpose of interrogatories such as the first interrogatory propounded by defendant is to identify persons who the opposing party contends has knowledge of relevant facts so that the party propounding the interrogatories can decide whether to depose the persons identified. In the context of a disparate treatment case persons alleged by a plaintiff to have been given preferential treatment over her (or persons purporting to have knowledge of other such persons) obviously are persons whom the defendant may chose to depose.[3] If such

---

2. Plaintiff has made no contention that she failed to disclose the identity of Ms. Rohls and Mr. Fuller because she was unaware of their existence when she initially answered defendant's interrogatories and that thereafter she forgot to supplement her response.

3. Plaintiff contends that defendant "wants it both ways" since (1) Mr. Fuller and the persons referred to by Ms. Rohls did not work at the same

facility where plaintiff worked, and (2) defendant refused to provide any information relating to any technicians and managers outside of the region in which plaintiff worked. Plaintiff never sought to compel any additional information from defendant. More to the point, plaintiff obviously takes the position that the facts averred to by Ms. Rohls and Mr. Fuller are relevant and that they possess "information pertaining to ...

persons are not identified in response to an interrogatory such as the first interrogatory propounded by defendant, the very thing that happened here inevitably will occur. When the identity of the persons with the knowledge about comparators ultimately is disclosed (either in response to a motion for summary judgment filed by defendant or in preparation of the pretrial order), the schedule set by the court inevitably will be disrupted, causing unnecessary delay and expense. To allow this to happen without sanctioning the responsible party would be contrary to the principles of sound case management that the Federal Rules are intended to implement.

Against this background I have decided that an appropriate sanction is not to strike the affidavits of Ms. Rohls and Mr. Fuller but to require plaintiff's counsel to pay defendant $125 in partial compensation for the attorneys' fees expended in preparing the memoranda submitted in connection with the motion to strike and an additional $125 into the registry of the Court to partially reimburse taxpayers for the time this court has had to expend in considering an issue that should not have been before it.

Date: September 14, 1999.
/s/

J. Frederick Motz

United States District Judge

### ORDER

For the reasons stated in the memorandum entered herewith, it is, this 16th day of September 1999

ORDERED

1.  Defendant's motion to strike affidavits is denied; and

2.  Plaintiff's counsel is required to pay $125 to defendant and $125 to the Clerk of the Court, said payments to be made on or before September 30, 1999.

[her] claims." Furthermore, Ms. Rohls' affidavit testimony concerning the technology available to her as a dispatcher enabling her to know wheth-er a particular job required pole climbing is not limited to any particular facility or region.